UNITED STATES DISTRICT COURT
NORTHNER DISTRICT OF ILLINOIS

| | |
|---|---|
| DANIEL BERNDT, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| MONDELĒZ GLOBAL LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Daniel Berndt ("Plaintiff"), individually and on behalf of all other similarly situated individuals (the "Class Members," as defined below), by and through counsel, file this Amended Class Action Complaint against Mondelēz Global LLC ("Mondelēz" or "Defendant") and allege the following based on personal knowledge of facts pertaining to him and on information and belief based on the investigation of counsel as to all other matters.

## I.    NATURE OF THE ACTION

1.      Mondelēz is a food retailer and is part of one of the largest snack companies in the world. Mondelēz is a wholly owned subsidiary of Mondelēz International, Inc., which had global net revenues of approximately $31.5 billion in 2022.[1]

2.      Plaintiff and the other Class Members are current and former employees of Mondelēz.   As part of their employment, Plaintiff and the Class entrusted their sensitive information to Mondelēz with the reasonable expectation that Mondelēz would maintain that information safely and securely.   Defendant betrayed the trust of Plaintiff and the other Class

---

[1] *See* https://www.mondelezinternational.com/About-Us.

Members by failing to properly safeguard and protect their personal identifiable information and thereby enabling cybercriminals to steal such valuable and sensitive information.

3.      Plaintiff and the Class Members (as further defined below) have had their personal identifiable information exposed as a result of Mondelēz's inadequately secured computer network.

4.      This class action seeks to redress Mondelēz's unlawful, willful and wanton failure to protect the personal identifiable information of approximately 51,110 individuals that was exposed in a major data breach of Defendant's network (the "Data Breach" or "Breach"), in violation of its legal obligations.[2]

5.      The Data Breach was discovered on February 27, 2023, when Mondelēz became aware of unauthorized activity on its systems, including in an area it used to store customer files.[3] Mondelēz investigated the attack with the assistance of legal counsel and third-party computer specialists. The investigation confirmed that certain Mondelēz systems containing confidential and personal information had been accessed without authorization between at least February 23, 2023 until March 1, 2023.[4]  In addition, investigators determined unauthorized access on March 24, 2023, and "confirmed that an unauthorized third party acquired certain data."[5]

---

[2] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/ca25f29f-db60-4baf-ba53-8bae79da4d97.shtml.

[3] *See* https://www.doj.nh.gov/consumer/security-breaches/documents/mondelez-global-20230615.pdf.

[4] *Id.*

[5] *Id.*

6.      According to Mondelēz, the personal identifiable information exposed in the Breach included: social security number, first and last name, address, date of birth, marital status, gender, employee identification number, and Mondelēz retirement and/or thrift plan information (the "Private Information").[6]

7.      Due to Defendant's negligence, cybercriminals obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of hundreds of thousands of individuals.

8.      For the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Plaintiff and Class Members will have to spend time responding to the Breach and are at an immediate, imminent, and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, deprivation of the value of their Private Information, loss of privacy, and/or additional damages as described below.

9.      Plaintiff brings this action individually and on behalf of the Class, seeking remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, injunctive relief, reasonable attorney fees and costs, and all other remedies this Court deems proper.

---

[6] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/ca25f29f-db60-4baf-ba53-8bae79da4d97.shtml; *see also* Breach Notice Letter, attached hereto as Exhibit 1.

## II. THE PARTIES

**Plaintiff**

10. Plaintiff Daniel Berndt is domiciled in and a citizen of Illinois.

11. Sometime shortly after June 15, 2023, Plaintiff received a breach notification letter from Mondelēz informing him that his personal information had been exposed to cybercriminals during the Data Breach. According to the notice letter, Plaintiff's Social Security number, first and last name, address, date of birth, marital status, gender, employee identification number, and Mondelēz retirement and/or thrift plan information may have been accessed by unauthorized cybercriminals.

**Defendants**

12. Mondelēz is one of the largest snack companies in the world. In 2022, Mondelēz's parent company recognized global net revenues of approximately $31.5 billion.

13. Mondelēz Global LLC is a limited liability company food retailer, incorporated under the state laws of Delaware with its principal place of business located at 905 West Fulton Market, Suite 200, Chicago, Illinois.

## III. JURISDICTION AND VENUE

14. This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because this is a class action involving more than 100 Class Members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and many members of the class are citizens of states different from Defendant.

15. This Court has personal jurisdiction over Defendant because its principal place of business is in this District, it regularly transacts business in this District, and many Class Members reside in this District. Venue is likewise proper as to Defendant in this District because Defendant

employs a significant number of Class Members in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391(b)(2).

### IV. FACTUAL ALLEGATIONS

#### A. The Data Breach

16.     The Data Breach was discovered on February 27, 2023, when Mondelēz became aware of unauthorized activity on its systems, including in an area it used to store customer files.[7] Mondelēz investigated the attack with the assistance of legal counsel and third-party computer specialists. The investigation confirmed that certain Mondelēz systems containing confidential and personal information had been accessed without authorization between at least February 23, 2023 until March 1, 2023.[8]  In addition, investigators determined unauthorized access on March 24, 2023, and "confirmed that an unauthorized third party acquired certain data."[9]

17.     Social Security number, first and last name, address, date of birth, marital status, gender, employee identification number, and Mondelēz retirement and/or thrift plan information.

18.     Despite having known about the Data Breach since February 27, 2023, notices were not sent to affected individuals until June 15, 2023.

19.     Defendant failed to take the necessary precautions required to safeguard and protect Plaintiff's and the other Class Members' Private Information from unauthorized disclosure.

20.     Defendant also failed to provide timely and sufficiently notice to Plaintiff and Class Members.

---

[7] *See* https://www.doj.nh.gov/consumer/security-breaches/documents/mondelez-global-20230615.pdf.

[8] *Id.*

[9] *Id.*

21.     Defendant's actions represent a flagrant disregard of the rights of the Class Members, both as to privacy and property.

**B.     Plaintiff's Experience**

22.     Shortly after June 15, 2023, Plaintiff received a breach notification letter from Mondelēz informing him that his personal information, including his Social Security number, first and last name, address, date of birth, marital status, gender, employee identification number, and Mondelēz retirement and/or thrift plan information, had been potentially accessed and/or acquired by cybercriminals during the Data Breach.

23.     Plaintiff and Class Members' Private Information was provided to Defendant as part of his employment with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

24.     Omitted from the Notice Letter were any explanations as to why it took Defendant approximately four months after detecting the Data Breach to inform Plaintiff and Class Members of its occurrence, the details of the root cause of the Data Breach, the vulnerabilities exploited, the precise information that was exposed to cybercriminals, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

25.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

26.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

27.    The attacker accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiff and Class Members, including their Social Security numbers. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

28.    Because of the Data Breach, Plaintiff's Private Information is now in the hands of cyber criminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

29.    As a result of the Data Breach, Plaintiff has already spent numerous hours responding to the Data Breach. Among other things, Plaintiff has spent time researching the facts and scope of the Data Breach, monitoring his personal information, reviewing his financial statements for accuracy, and taking other steps in an attempt to mitigate the adverse consequences of the Data Breach. The letter Plaintiff received from Mondelēz specifically directed him to take these actions. Indeed, the letter stated: "We encourage you to remain vigilant by reviewing account statements and monitoring free credit reports. You should regularly change your passwords. You may want to temporarily freeze your credit. You should be on guard for schemes where malicious actors may pretend to represent Mondelēz or reference this incident."[10]

---

[10] *See* https://www.doj.nh.gov/consumer/security-breaches/documents/mondelez-global-20230615.pdf.

30.     As a direct and proximate result of the Data Breach, Plaintiff will likely need to purchase a lifetime subscription for identity theft protection and credit monitoring.

31.     Plaintiff has been careful to protect and monitor his identity.

32.     Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's Private Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff's Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's Private Information; and (e) continued risk to Plaintiff's Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

**C.     Cyber Criminals Have Used and Will Continue to Use Plaintiff's Private Information to Defraud Them**

33.     Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach can and will be used in a variety of sordid ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune.

34.     Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[11] For example, with the Private Information stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[12] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and the Class Members.

35.     Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[13]

[Emphasis added.]

---

[11] "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[12] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[13] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

36.     Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[14]

37.     This was a financially motivated Breach, as the only reason the cyber criminals go through the trouble of running a targeted cyberattack against companies like Mondelēz is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein.  Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[15]  "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[16]

38.     These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to Private Information, they **will** use it.[17]

39.     Hackers may not use the information right away, but this does not mean it will not be used.  According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information **may continue for years**. As a result, studies

---

[14] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu.

[15] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[16] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[17] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[18]

40.     For instance, with a stolen social security number, which is part of the Private Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[19]

41.     The ramifications of Defendant's failure to keep its Class Members' Private Information secure are long lasting and severe. Once that information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

42.     Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

43.     Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[20] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[21]

---

[18] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu.

[19] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[20] *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2.

[21] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:*

44.     Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[22]

45.     Defendant's offer of limited identity monitoring to Plaintiff and the Class is woefully inadequate and will not fully protect Plaintiff from the damages and harm caused by its failures. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. Once the offered coverage has expired, Plaintiff and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Mondelēz's gross negligence. Furthermore, identity monitoring only alerts someone to the fact that they have *already been the victim of identity theft* (*i.e.*, fraudulent acquisition and use of another person's Private Information)—it does not prevent identity theft.[23] Nor can an identity monitoring service remove personal information from the dark web.[24] "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[25]

---

https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

[22] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

[23] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

[24] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[25] *Id.*

46.     As a direct and proximate result of the Data Breach, Plaintiff and the Class have had their Private Information exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of further harm from fraud and identity theft. Plaintiff and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Even more seriously is the identity restoration that Plaintiff and other Class Members must go through, which can include spending countless hours filing police reports, following Federal Trade Commission checklists, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps.

47.     Plaintiff and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

a.  Actual identity theft, including fraudulent credit inquiries and cards being opened in their names;

b.  Trespass, damage to, and theft of their personal property including Private Information;

c.  Improper disclosure of their Private Information;

d.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and having been already misused;

e.  Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their Private Information and that identity thieves have already used that information to defraud other victims of the Data Breach;

f.  Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

g.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

h.  Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' personal information for which there is a well-established and quantifiable national and international market;

i.  The loss of use of and access to their credit, accounts, and/or funds;

j.  Damage to their credit due to fraudulent use of their Private Information; and

k.  Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

48.  The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[26] For example, Private Information can be sold at a price ranging from $40 to $200.[27] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[28]

49.  Moreover, Plaintiff and Class Members have an interest in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting Plaintiff's Private Information.

---

[26] Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[27] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[28] *In the Dark*, VPN Overview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

50.     Plaintiff and Class Members also have an interest in ensuring that their personal information that was provided to Mondelēz is removed from Mondelēz's unencrypted files.

51.     Defendant acknowledged, in its letter to Plaintiff and other Class Members, that the Data Breach would cause inconvenience to effected individuals by providing numerous steps for Class Members to take in an attempt to mitigate the harm caused by the Data Breach.[29]

52.     In particular, the letter acknowledged that financial harm would likely occur, advising Class Members to "to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity."

53.     At Mondelēz's suggestion, Plaintiff is desperately trying to mitigate the damage that Mondelēz has caused her.  Given the kind of Private Information Mondelēz made accessible to hackers, however, Plaintiff is very likely to incur additional damages. Because identity thieves have his Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[30]

54.     None of this should have happened.

**D.    Defendant was Aware of the Risk of Cyber Attacks**

55.     Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some

---

[29] *See* https://www.q-staffing.com/wp-content/uploads/2022/06/Qualified-Staffing-Website-Notice.pdf; *see also* Exhibit 1, attached hereto.

[30] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

of the biggest cybersecurity breaches: Target,[31] Yahoo,[32] Marriott International,[33] Chipotle, Chili's, Arby's,[34] and others.[35]

56.    Mondelēz should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained.

57.    To be sure, Mondelēz has already been the victim of previous data breaches that similarly exposed individual's unencrypted personal information to the extent that it required Mondelēz to issue notices to affected individuals and various states' Attorneys' General.[36]

58.    Moreover, Mondelēz's website boasts, "[p]rotecting your personal information is important to us."[37] Mondelēz's privacy policy further ensures, "[w]e maintain administrative,

---

[31] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[32] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[33] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[34] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[35] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[36] *See* https://www.doj.nh.gov/consumer/security-breaches/documents/mondelez-international-20180816.pdf.

[37] *See* https://www.mondelezinternational.com/Privacy-Policy#otnotice-section-0b809480-5293-4d75-aee1-8c4afd2a12ca.

technical, and physical safeguards designed to help protect against unauthorized use, disclosure, alteration, or destruction of the personal information we collect…."[38]

59.     Mondelēz's assurance makes it evident that Mondelēz recognized it had a duty to use reasonable measures to protect the Private Information that it collected and maintained.  Yet, it appears that Mondelēz did not meaningfully or comprehensively use the reasonable measures, including the measures it claims to utilize.

60.     Mondelēz was clearly aware of the risks it was taking and the harm that could result from inadequate data security.

### E.     Mondelēz Could Have Prevented the Data Breach

61.     Data breaches are preventable.[39] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[40] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[41]

62.     "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information

---

[38] *Id*.

[39] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[40] *Id.* at 17.

[41] *Id.* at 28.

security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[42]

63.     In a Data Breach like this, many failures laid the groundwork for the Breach.  The FTC has published guidelines that establish reasonable data security practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[43]   The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

64.     Upon information and belief, Mondelēz failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, Mondelēz also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the

---

[42]*Id.*

[43] FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

65.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[44]

66.     To prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

---

[44] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[45]

67.     Further, to prevent and detect cyberattacks, including the attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

---

[45] *Id.* at 3-4.

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[46]

68.     In addition, to prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

  - Prioritize and treat commodity malware infections as potential full compromise;

---

[46] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001.

- **Include IT Pros in security discussions**

    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events

- **Harden infrastructure**

    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection
    - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[47]

69.     Given that Defendant was storing the Confidential Information of more than 80,000 individuals, Defendant could and should have implemented all of the above measures to prevent and detect malicious cyberattacks.

70.     Specifically, among other failures, Mondelēz had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[48] Indeed, the United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal

---

[47] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[48] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, Aug. 14, 2018, https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

information, stating "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[49]

71.     In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all confidential information.  Further, the Data Breach could have likely been prevented had Defendant utilized appropriate malware prevention and detection technologies.

**F.      Defendant's Response to the Data Breach is Inadequate to Protect Plaintiff and the Class**

72.     Defendant failed to inform Plaintiff and Class Members of the Data Breach in time for them to protect themselves from identity theft.

73.     Defendant stated that it discovered the Data Breach in October 2021. And yet, Mondelēz did not notify affected individuals until June 2022—*eight months after it learned of the Data Breach*.  Even then, Mondelēz failed to inform Plaintiff and Class Members exactly what information was exposed in the Data Breach, leaving Plaintiff and Class Members unsure as to the scope of information that was compromised.

74.     During these intervals, the cybercriminals were exploiting the information while Mondelēz was secretly still investigating the Data Breach.

75.     If Mondelēz had investigated the Data Breach more diligently and reported it sooner, Plaintiff and the Class could have taken steps to protect themselves sooner and to mitigate the damages caused by the Breach.

---

[49]"Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

## V.    CLASS ACTION ALLEGATIONS

76.    Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

77.    Plaintiff brings this action against Mondelēz on behalf of themselves and all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiff asserts all claims on behalf of a nationwide class (the "Class") defined as follows:

> All persons Mondelēz identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.

78.    Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

79.    Members of the Class are referred to herein as "Class Members."

80.    Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

81.    The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

82.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. Defendant has reported that the total number of individuals affected in the Data Breach was 51,110 individuals.

83.    **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Mondelēz's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class member because Plaintiff and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of Mondelēz.

84.     **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

85.     **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress Mondelēz's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

86.     **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a.  Whether Defendant engaged in the wrongful conduct alleged herein;

b.  Whether Defendant failed to adequately safeguard Plaintiff's and the Class's Private Information;

25

c.   Whether Defendant owed a duty to Plaintiff and the Class to adequately protect their Private Information, and whether it breached this duty;

d.   Whether Mondelēz breached its duties to Plaintiff and the Class as a result of the Data Breach;

e.   Whether Mondelēz failed to provide adequate cyber security;

f.   Whether Mondelēz knew or should have known that its computer and network security systems were vulnerable to cyber attacks;

g.   Whether Mondelēz's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its company network;

h.   Whether Mondelēz was negligent in permitting unencrypted Private Information of vast numbers of individuals to be stored within its network;

i.   Whether Mondelēz was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach to include former employees, applicants, and business associates;

j.   Whether Mondelēz failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and the Class;

k.   Whether Mondelēz continues to breach duties to Plaintiff and the Class;

l.   Whether Plaintiff and the Class suffered injury as a proximate result of Mondelēz's negligent actions or failures to act;

m.   Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

n.  Whether Mondelēz's actions alleged herein constitute gross negligence, and whether Plaintiff and Class Members are entitled to punitive damages.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of all Plaintiff and the Class)

87.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

88.    Defendant Mondelēz solicited, gathered, and stored the Private Information of Plaintiff and the Class.

89.    Defendant had full knowledge of the sensitivity of the Private Information it maintained and of the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information. Plaintiff and the Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their Private Information that was in Mondelēz's possession. As such, a special relationship existed between Mondelēz and Plaintiff and the Class.

90.    Defendant was well aware of the fact that cyber criminals routinely target corporations, particularly those servicing the health industry, through cyberattacks in an attempt to steal the collected Private Information.

91.    Defendant owed Plaintiff and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard

27

such data and providing notification to Plaintiff and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

92.     Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

93.     Defendant had duties to protect and safeguard the Private Information of Plaintiff and the Class from being vulnerable to cyberattacks, including by encrypting documents containing Private Information, by not permitting documents containing unencrypted Private Information to be maintained on its systems, and other similarly common-sense precautions when dealing with sensitive Private Information. Additional duties that Mondelēz owed Plaintiff and the Class include:

   a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Private Information in its possession;

   b.   To protect the Private Information in its possession using reasonable and adequate security procedures and systems;

   c.   To adequately and properly audit and test its systems;

   d.   To adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information;

   e.   To train its employees not to store Private Information for longer than absolutely necessary;

   f.   To implement processes to quickly detect a data breach, security incident, or intrusion; and

28

g. To promptly notify Plaintiff and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

94. Defendant's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the Federal Trade Commission, the unfair practices by companies such as Defendant of failing to use reasonable measures to protect Private Information. Plaintiff and Class Members are consumers under the FTC Act. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and by not complying with industry standards. Accordingly, Defendant has committed negligence *per se* by violating the FTC Act.

95. Various FTC publications and data security breach orders further form the basis of Defendant's duty.

96. Plaintiff and the Class were the intended beneficiaries of Defendant's duties, creating a special relationship between them and Mondelēz. Defendant was in a position to ensure that its systems were sufficient to protect the Private Information that Plaintiff and the Class had entrusted to it.

97. Defendant breached its duties of care by failing to adequately protect Plaintiff's and Class Members' Private Information. Defendant breached its duties by, among other things:

a. Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the Private Information in its possession;

b. Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;

29

c.  Failing to adequately and properly audit and test its computer systems to avoid cyberattacks;

d.  Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information, including maintaining it in an encrypted format;

e.  Failing to consistently enforce security policies aimed at protecting Plaintiff and the Class's Private Information;

f.  Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

g.  Failing to abide by reasonable retention and destruction policies for Private Information it collects and stores; and

h.  Failing to promptly and accurately notify Plaintiff and Class Members of the Data Breach that affected their Private Information.

98.    Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

99.    As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

100.    The damages Plaintiff and the Class have suffered (as alleged above) were and are reasonably foreseeable.

101.    The damages Plaintiff and the Class have and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

102.    Plaintiff and the Class have suffered injury, including as described herein, and are entitled to actual and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of all Plaintiff and the Class)**

103.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

104.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

105.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

106.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

107.    Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

108.    The harm that has occurred is the type of harm that the FTC Act intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

109. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

110. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

111. As a direct and proximate result of Defendant's negligence per se, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) lost or diminished value of their Private Information; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; (v) damage to their credit scores; and (vi) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

112. As a direct and proximate result of Defendant's negligence per se, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

113. Additionally, as a direct and proximate result of Defendant's negligence per se, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private

Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

114.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

115.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

116.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of all Plaintiff and the Class)**

117.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

118.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of their labor and by providing their valuable Private Information to Defendant.

119.    Plaintiff and Class Members provided Defendant their labor and Private Information on the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue it derived therefrom. In exchange, Plaintiff and Class Members should have received adequate protection and data security for such Private Information held by Defendant.

120.    Defendant benefited from receiving Plaintiff's and Class Members' labor and from receiving their Private Information through its ability to retain and use that information for its own benefit. Defendant understood and accepted this benefit.

121.    Defendant collected, maintained, and stored the Private Information of Plaintiff and Class Members and, as such, Defendant had direct knowledge of the monetary benefits conferred upon it by Plaintiff and Class Members.

122.    Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiff and Class Members and accepted that monetary benefit.

123.    However, acceptance of the benefit under the facts and circumstances described herein make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

124.    Under the principle of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff and Class Members because Defendant failed to implement the appropriate data management and security measures.

125.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

126. If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to allow Defendant to have or maintain their Private Information.

127. As a direct and proximate result of Defendant's decision to profit rather than provide adequate data security, Plaintiff and Class Members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably should have expended on data security measures to secure Plaintiff's Private Information, (ii) time and expenses mitigating harms, (iii) diminished value of the Private Information, (iv) harms as a result of identity theft; and (v) an increased risk of future identity theft.

128. Defendant, upon information and belief, has therefore engaged in opportunistic, unethical, and immoral conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiff and the Class in direct violation of Plaintiff's and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

129. Accordingly, Plaintiff and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of all Plaintiff and the Class)**

130. Plaintiff and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

131.    Plaintiff and the Class entrusted their Private Information to Defendant in order to receive and maintain employment. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

132.    In its Privacy Policy, Defendant represented that it values personal information and has implemented measures to help ensure an appropriate level of data security.

133.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

134.    Defendant breached the implied contracts they made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

135.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

136.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of all Plaintiff and the Class)**

137.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

138.    At all relevant times hereto, Defendant owed, and owes, a fiduciary duty to Plaintiff and the Class, including its duty to keep Plaintiff and Class Members' Private Information reasonably secure.

139.    The fiduciary duty is explicated under the procedures set forth in the Health Insurance Portability and Accountability Act Privacy Rule, including, without limitation the procedures and definitions of 45 C.F.R. §160.103 and 45 C.F.R. §164.530, which required Defendant to apply appropriate administrative, technical, and physical safeguards to protect the privacy of patient information and to secure the health care information it maintains and to keep it free from disclosure.

140.    Defendant breached its fiduciary duty to Plaintiff by failing to implement sufficient safeguards and by disclosing Plaintiff's and other Class Members' Private Information to unauthorized third parties.

141.    As a direct result of Defendant's breach of its fiduciary duty of confidentiality and the disclosure of Plaintiffs' confidential Private Information, Plaintiff and the Class Members have suffered damages.

142.     As a direct result of Defendant's breach of its fiduciary duty and the disclosure of Plaintiff's and Class Members' Private Information, Plaintiffs and the Class have suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, confidentiality, embarrassment, emotional distress, and humiliation.

143.     Plaintiffs and the other Class Members suffered and will continue to suffer damages including, but not limited to: (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of the Private Information; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; (vii) loss of the benefit of the bargain; and (viii) emotional distress.  At the very least, Plaintiff and the Class are entitled to nominal damages.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

    a.  An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

    b.  A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including compensatory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

    c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

    d.  An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e.  A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

f.  An award of such other and further relief as this Court may deem just and proper.

### VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Complaint.

Dated: June 23, 2023                                Respectfully submitted,

/s/ *David K. Lietz*
David K. Lietz
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW, Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
dlietz@milberg.com

A. Brooke Murphy
(*pro hac vice* application forthcoming)
**MURPHY LAW FIRM**
4116 Will Rogers Pkwy, Suite 700
Oklahoma City, OK 73108
Telephone: (405) 389-4989
abm@murphylegalfirm.com

# EXHIBIT 1



Return Mail Processing
PO Box 589
Claysburg, PA 16625-0589

June 15, 2023

J5767-L01-0028704 T00070 P003 ********SCH 5-DIGIT 61080
DANIEL BERNDT



Re: **NOTICE OF DATA BREACH**

Dear Daniel Berndt:

Mondelēz Global LLC ("Mondelēz," "we," "us," "our") is writing to inform you of an incident that involved some of your personal information. While we are unaware of any attempted or actual misuse of your information, we are providing you with information about the event, our response, and steps you can take to protect your personal information. Mondelēz takes this incident and the security of your personal information very seriously, and we sincerely regret any concern or issue this incident may cause.

**WHAT HAPPENED?** Mondelēz retained the legal services of the law firm Bryan Cave Leighton Paisner LLP ("Bryan Cave") to provide advice on customary legal matters of a company its size. To provide these services, Bryan Cave obtained some personal information of current and former Mondelēz employees.

Bryan Cave has stated that on February 27, 2023, it detected unauthorized access to its systems, including an area it used to store certain customer files. This access occurred from February 23, 2023 until March 1, 2023. Bryan Cave initiated a robust investigation with the assistance of an outside cybersecurity forensics firm and notified law enforcement. Bryan Cave informed us of unauthorized access on March 24, 2023, while continuing to investigate the incident, and later confirmed that an unauthorized third party acquired certain data, which was still being determined. On May 22, 2023, based upon additional information received from Bryan Cave, Mondelēz determined that it finally had enough information to determine who was impacted and that affected individuals should be notified. Mondelēz proceeded to conduct a thorough review of impacted information to identify all affected current and former employees, which was just completed, and is now providing notification. Please know that this incident did not occur on or affect Mondelēz systems or networks in any way.

**WHAT INFORMATION WAS INVOLVED?** The investigation determined that the personal information which was included in the impacted data may include your: social security number, first and last name, address, date of birth, marital status, gender, employee identification number, and Mondelēz retirement and/or thrift plan information. Financial information, such as account information or credit card numbers, were not involved in this incident.

**WHAT WE ARE DOING.** Please know that protecting your personal information is something that Mondelēz takes very seriously. Bryan Cave conducted an investigation with an outside cybersecurity forensic firm to confirm the nature and scope of the incident. Bryan Cave also notified law enforcement. Bryan Cave informed us that they have taken steps to address the incident and prevent a similar occurrence in the future. Mondelēz is providing notice and offering credit monitoring services to individuals based on the personal information that was potentially impacted.

B096059



0028704

J5767_L01